We'll turn to our final case on the calendar. Case 25-4028, IO Inc. versus IO Products, Inc. Good morning. May it please the Court, Margaret Caruso for Appellant's Defendants. I'd like to reserve four minutes of my time for rebuttal. We're here because of an injunction the District Court entered for an indefinite amount of time, but set to last at least three and a half months. Following the submission of evidence, including declarations from at least seven non-attorney witnesses and oral argument, under this Court's precedent and that of the U.S. Supreme Court, this order is appealable as a preliminary injunction. The injunction was improperly granted for three reasons. First, the District Court should not have exercised jurisdiction to hear it. Second, what is knowable about the sleek craft factors at this stage cannot support an injunction. And third, the plaintiff did not carry its burden of showing irreparable harm. I'd like to start with ripeness and invoke the standard the Supreme Court confirmed just last year in Murthy v. Missouri. The plaintiff must demonstrate that in the near future it will suffer an injury that is traceable to the defendants and redressable by the injunction it seeks. The plaintiff here has not done so. The District Court premised the injunction on the supposed imminence of a situation in which the defendants have said that their earliest product is at least a year away, and there is no evidence that the defendants will ever offer a product with I.O. in the name. And beyond that, neither side is shipping products that the plaintiff claims would be competitive. Neither ever has. For its part, the plaintiff has been publicly touting its product since April 2024. Well, so there is, I mean, we've seen the video. There is a reference to some big product that's in the works. And so why is that not sufficient to create ripeness? That's not sufficient to create ripeness because it's not the in-the-works piece of it is indisputably at least a year away from being advertised or sold or offered for sale. But is this not some kind of advertisement itself? It's not, Your Honor, because, well, what's important here for purposes of the Lanham Act is not just general advertising, but advertising of a good. And that is not advertising of a good. There's no specific product that's identified. You can't tell the product category from the references that are made in the course of that almost nine-minute video. It's clear in the record there is no design that has been confirmed. We don't even know the form factor. I would say that there's not a case that has a better developed record that consumers have no idea what this thing is. So when would it become ripe? It would become ripe if the defendants announce a product with the I.O. name. And your position is they just haven't done that yet? Correct. Counsel, what do we do with the fact that in the, there is email exchanges indicating that there is this prototype, there is email exchanges that it is a direct competitor by, I believe, Altman himself. What do we do with that in terms of the ripeness issue? Sure. So Mr. Altman's email reference says something competitive, I.O. He's talking about the venture, I.O. There's no commitment to a product that's going to be called that. And whether that's competitive in the Lanham Act sense as opposed to just some general sense of competitive is a different issue. And what we have here also in the record is an email exchange between the chief executive of the plaintiff and one of the employees of I.O. in which the defendant, I.O. Products, Inc. And the defendant says to Mr. Rugelow, we have a very different product vision. And Mr. Rugelow responds, I hear you about the different product vision. So when you're talking about the people who actually are engaged in what's being developed, it's a different product. They're not saying that these are products that are going to go head to head. And we just don't know enough. In the Yugo Labs decision, this court was clear that the precise kind of product at issue matters here. And that's just not known. So even if there was constitutional ripeness in this case, there would not be prudential ripeness because it's so uncertain. But even before we get to that, we just have to look at the namespace decision. And in namespace in which the Court considered ripeness in the context of the trademark case, it said a case is not fit for decision if it can't be decided without considering contingent future events that may or may not occur as anticipated or, indeed, may not occur at all. But that's exactly what the district court did here, is consider these contingent future events. It may not occur at all that the parties are competing with each other. The record is clear that the plaintiff has been saying it's going to offer this product for over a year and a half, and it still has been unable to do so. I thought the video was that it was going to come out next year. The video is from 2024, and it said it was going to come out. The record shows various time points that the plaintiff has represented it will come out by, starting with winter of 2024. Then that was pushed to be sometime later, maybe in the summer, then September, then October, and now here we are in November. So in the namespace, the court said there is no actual imminent infringement, even though the defendant in that case had received nearly $35 million for applications to acquire the challenge domain names, but it hadn't yet assigned them. The case here is less ripe than that. It's also less ripe than the legal force case in which the district court found the trademark claim was not ripe, where the defendant had filed a U.S. trademark application and had publicly stated it was planning to expand into the U.S. within nine months. Here, at least a year, so longer than the legal force timeframe, and unlike in legal force where the defendant had products, services it was offering in Japan, it was just a question of when those products were going to come over to the U.S., here there are no products that are known. There's no existing products that OpenAI has ever released. Is there enough of a sense of what space this product is going to occupy that one could tell that it's in the space that the plaintiff has under the trademark? We don't know specifically what the product is.  And as CNET said in reporting on this, we are completely in the dark as to what the product is. We don't know. Is it going to be a screenless phone? Is it going to be some kind of wearable? Although we now know it's — Right. But do these distinctions matter in your view? Yes. They do matter because these are the kinds of things that the Court looks at and needs to look at in assessing the Sleecraft factors, for one thing, but in also in assessing advertising and whether there is any advertising, because, again, there's no product. There's nothing that's known and definite to gauge consumer reaction to, which is the core of what the Lanham Act is about, is protecting consumers from confusion. Does the district court's order on the contempt motion bring any clarity to your client on this? It certainly does because the district court there made very clear the TRO did not find that there was advertising in that May 21 announcement or order it to be removed. So, once again, it confirms, as we argued to this Court, that the district court's decision was not based on any actual advertising or infringement but on the district court's perception that it was imminent because the district court erroneously found that the product, whatever it might be, would be released within a year as opposed to not for at least a year. Was there not some reference to next year? The reference to next year in the video, yes. So 2026. It could be December 2026, again, which was further elaborated on by Mr. Tan in his declaration, at least a year from the time of his declaration in the summer. So we submit that the case is not ripe for dispute. It should be remanded for dismissal. But even, as I said, if constitutional ripeness was found, there's too many facts that are unknown here for the district court to have properly exercised discretion to hear the case. And that is because if you look at what the district court did, how it analyzed the sleep care factors, you see the indications that they're all based on guesses about the future and about intent. So, for example, in analyzing the consumer care factor, the court looked at intended buyers and the intended purpose of the expected products. And then also relied on characteristics of a product, specifically as to the in-ear molding piece, that had not even been announced yet by the plaintiff. In analyzing the proximity factor, the court evaluated not the actual products, but the intended goals of the products. In analyzing the strength of the mark factor, the court wrote plaintiff may show that defendant's use may swamp the reputation of the IYO mark, and plaintiff's reputation and business could be affected. And the court recognized the absence of the kind of evidence that must be assessed in analyzing sleep craft. In analyzing similarity of the marks, as the court acknowledged, there is no marketing of defendant's products for comparison. But that's how you analyze the similarity of the marks. So when we look at what the district court did, we can see it was very hypothetical. It's not based on what are the facts for the period of the injunction. So there was clear error in concluding that it was ripe. Well, that's a de novo question. But it was also clear error in deciding that confusion was likely. And when we've gone through in our briefs, of course, all the various errors that the court made, but I would like to highlight just two of those in connection with the substance of the sleep craft factors she looked at. And one of those is in connection with consumer care, which is hugely important here. The consumers of the plaintiff's promised in-ear devices cannot plausibly be found to be careless in their decision to purchase a custom-molded in-ear device that costs more than $1,000, that they have to arrange for someone to come to their house and inject goo in their ear to get this scan. This is not an inexpensive item that, you know, like a bag of potato chips that someone might see a claim about air frying on. No batch of chips, yeah. This can — and it can't be purchased in the supermarket checkout line. This can only come from the plaintiff itself. So they're seeing it in its full context. And really, that alone, the price and the conditions, dictate not finding the likelihood confusion here. And as far as similarity, the marks go again, needs to be considered in the marketplace, which doesn't exist here. But even if it did, the court ignored the similarity of meaning analysis. I see my time is quickly ticking away, so let me just touch very quickly on irreparable harm and say that the plaintiff has not shown it's likely to be irreparably harmed during the injunction period in any way that's remediable by the injunction. The plaintiff is not entitled to the presumption for the reasons we said, but even if so, the presumption fails given the lack of eminence and given the categorical mismatch between the relief the plaintiff seeks and the supposed harm that it has shown relating to its ability to fund-raise and its investors. It is implausible that investors who are, in fact, assuming they are, in fact, concerned about the name are going to be satisfied, sufficient to invest during an injunction period. Okay. Let's put three minutes on the clock for rebuttal. When you come back, we'll hear from your opposing counsel. Thank you. Good morning. May it please the Court. Anthony Viola of Mints-Levin for the plaintiff appellees. There are four main points that I'd like to make today. The first is that we shouldn't be here hearing this case. There is not appellate jurisdiction. This Court's decision in United States v. Eldorado made very, very clear that the Carson test, which is reiterated by the Supreme Court in Abbott v. Perez in 2018, requires that the appellants make a showing of all three elements of the Carson test. They have utterly failed to do that. Their argument that they needn't satisfy all three elements of the Carson test flies in the face of this Court's decision in Eldorado, which held very clearly that there are two kinds of interlocutory orders. There are those that fall facially within the scope of 1292. This one doesn't. TROs have been held repeatedly not to be generally appealable because they do not fall within 1292. The other class of cases are those which meet the Carson test. And this Court in Eldorado ---- The duration, the adjudicative process that led to this, is this not fall within the case law that says that's appealable? That's the first step of the Carson test, Your Honor. The Carson test then says if the order that's sought to be appealed meets the practical effect of an injunction, it still needs to meet the other two elements, which is an immediate irreparable harm which cannot be effectually appealed. And these defendants cannot meet either of those two prongs. Can we hear on the ripeness? I mean, so the other side says, you know, this is just not right because we really haven't disclosed what the product is. So how do you respond to that? Certainly, Your Honor. The ripeness test calls for invasion of a legally protected right, which you have here, registered Federal trademark, and either actual or imminent harm. We have actual harm here. We have a plaintiff whose business was going well. They had raised money. They were in the middle of a raise. They're in the process of manufacturing 20,000 units. They had presales of these units. And all of that came to a screeching halt on May 21, 2025. The only thing that happened on May 21, 2025, with respect to these parties, is that the defendants made their announcement and put out their video. And we submitted evidence, unrebutted in the record, of the effect, the immediate effect of what the defendants did on my client, including drying up of all funding, the inability to fund manufacturing, the inability to fund an advertising campaign, and to hire. I would refer this Court to, first of all, its decision in La Quinta, where subject-matter jurisdiction was found on a far, far lesser showing of harm. That case involved the plaintiff, an American hotel chain, a mid-level hotel chain, and a Mexican high-end group of hotels. One was called La Quinta, and one was called Quinta Real. The Mexican company entered into a letter of intent to build a hotel in the United States, which came to nothing. No hotel was ever built. Two years later, they entered into another letter of intent to build a hotel in another city. Also came to nothing. No hotel ever built. There were no particulars about the size of these hotels, if they would be in cities that the plaintiff had hotels in, the amenities, the rates, none of that. So the defendants say, you know, we have not announced what specific product this is going to be. I take your position that that is not determinative, so why do you say that? Well, two things, Your Honor. First, let's be clear what the defendants are asking this Court to do. The defendants are asking this Court to make a momentous decision. They're asking this Court to say that a statement cannot be advertising if they have not put their product out for review. But the fundamental question of what the defendants did and whether it constitutes advertising is a fact question. And that was a fact question that was within the discretion of the district court to review. As a matter of fact, there's a case at the defendant's side, and it's a false advertising case. It's a little bit different. But the question was, in that case, did the defendant — what did the defendant do? Did it constitute advertising or promotion? And that was put to the jury. And this Court affirmed. It's a fact question. So they're asking you to give this categorical answer that says if they don't have a product actually for sale, it can't be advertising. Now, we know that can't be true because this Court in Bosley and in other decisions has said repeatedly that an actual sale does not need to occur for there to be a Lanham Act violation. Well, how about the argument that, you know, this is just a venture? We are promoting a venture. We're not promoting a product. Well, okay. Mr. Altman and Mr. Tan both say in emails that they're working on something competitive called I.O. Now, the district court was entitled to find on the basis of that evidence that they're talking about the product. The defendants have submitted no declaration from the authors of those emails saying, no, we weren't talking about the product. We were talking about something else. But in any event, how does one — Sorry, counsel. I'm sorry. With respect, I'm looking at the email and it says, thanks, but I'm working on something competitive. So we'll respectfully pass. It didn't say what you just articulated. So did you want to clarify? It says called I.O. right after that. Am I missing that? Oh, I see. Parentheses. Now I see that. Thank you. Yes. And the defendants' argument, we're arguing as well, these gentlemen were speaking about the product. I.O., my client, the real I.O., plaintiff I.O., had just gone to the defendants' offices and demonstrated our product. And now they come back and say, well, we're going to be competitive called I.O. But even if one could stretch this somehow to conclude that Mr. Allman was talking about, well, the venture is going to be called I.O. and the venture is going to be competitive, the only way the venture competes is through its product offerings. So this is a difference without a difference, a distinction without a difference. In terms of evidence that what the defendants did was an advertisement, let's understand this. Open AI is a software company. It creates Jack GBT. It creates apps. It creates AI. And it has now decided, very clear from what they said, to go into the hardware business. Okay? And defendants suggest in their brief that, well, the hardware that they come out with might be a washing machine or it might be a BattleBot. That's not the business they're in, number one. Number two, that's not what they said in their announcement and in the video in particular. They said, quote, I.O. was formed, quote, with the mission of creating a family of devices that will allow regular people to make the most use of plaintiff's space. The video starts with… Can I ask you, on the TRO, the TRO covers the marketing or sale of related products. So what's your understanding of what that would refer to, the relatedness? I think the only reasonable understanding of that is that it refers to products that are related to our products, that are in the same space, that provide the same sort of functionality or intended to reach the same audience as our space. And the video makes very clear, the announcement makes very clear, that's exactly what these defendants are doing. Mr. Altman in the video talks about the fact that there's this, you know, wonderful genius A.I. in the cloud. He talks about the limitations of how people access that A.I. right now. He talks about you have to open your laptop, you have to touch the screen, you have to type, you have to wait, you have to open a browser. And he says, that's not good enough. We're going to do something better. We're going to do a different way of connecting people with the cloud. And that's exactly what my client said. If you compare the TED talk that my client gave in 2024 with the Altman Eye video in 2025, it's startling the overlap between those. I would, just on the rightness point, in addition to LaQuinta, where the court had far less information than it has here, it concluded that it had subject matter jurisdiction, it went on to do a full Sleekcraft analysis with far less information than we have here. I would also refer the court to the district court's decision in JGX, where there's a restaurant that was going to try to be opened. And the court there concluded that the defendant's action had driven licensees and franchisees and potential landlords not to do business with the plaintiff. And that created rightness. So here we have both actual and imminent injury. Reduced to its essence, the defendants are arguing to you that they should be free to usurp my client's trademark and to steal its goodwill, and that neither we nor this court can argue about it if they're sufficiently vague about their product. That is not the standard. I would refer this court to a decision, it's admittedly from the Southern District of New York, with the AARP case, where the court did a canvassing of cases in this area and came to the conclusion, quote, where, however, a party has produced a prototype, we have that here, begun soliciting and advertising to potential customers, or otherwise invested significant sums of money in the preparation for producing goods, the case or controversy requirement is satisfied. We have people who have invested $6.5 billion in this enterprise. They have taken out the domain name, io.com. They have taken out the domain name. They have built a prototype. They have announced it to the world. They've told the world exactly what its function is, intended to be, and have told the world it's the greatest thing since sliced bread. This is a classic teaser ad. We've all seen them. New and improved model, coming soon. We're not going to tell you how it's new and improved, but wait. Or the example we gave in our brief of Toyota announcing on the Super Bowl, we're going to have a new car next year called the Mustang. They don't tell you anything about it. Would anyone really think that Ford could do nothing about that? And when do we have to wait? But the defendants are setting up a catch-22 here, Your Honor. They're saying we can't sue them until they've fully developed their product, they've spent a year or two or whatever it is that they want to spend on it, and then they announce it to the world. Well, if we wait until then, you and I and everyone in this courtroom know they'd be here arguing latches, that we waited too long. The timing, I would also just like to speak to, for one moment, the defendants argue that the district court was wrong when it said when the defendants would come out with this product. The district court said the product's going to come out next year. If you look at the video at the end, it says look for our product next year, 2026. There's a continuum here. The cases that the defendants rely on, namespace and legal force, are at one end. And at that end, the defendants had done nothing. Counsel just misdescribed legal force. She said they had announced their intention to come into the United States. But if you read the district court's decision, it says, yes, but that press release did not mention the trademarks that were at issue in the case. That press release only said we're coming into the United States with other marks. So the district court concluded that defendants had done nothing, taken no steps towards infringing or showing an intent to infringe. In namespace, namespace involved ICANN, which governs top-level domains. It had opened up an application process for people to apply, to try to register domains. No domains had been given out. No one knew if any domains would be given out. No one knew what the users of those domains, if they obtained them, would do with them. No one knew if ICANN would actually give out a domain that was being used by the plaintiff. Nothing had been done. We are clearly in the paradigm of JJX Thea, where folks announced that they were going to develop a satellite system in five years and put it up in five years. Kythera, folks were working on products that needed to be FDA approved and weren't and couldn't be sold, were not in the market. In all of these cases, including this Court's decision in La Quinta, the courts nevertheless found rightness, went ahead and did a full, sleek, craft analysis. And there's no reason with the information we have here, which is far more than in those cases, that can't be done correctly. The defendants' objections to the district court's likelihood of confusion analysis come down to disagreements about weighing and sifting the evidence. It's not — there's nothing clearly erroneous in what the district court did. It cited the correct standards and applied the correct standards. It's taking you a little over your time. Let me see if my colleagues have other questions for you. Ms. Riola, thank you very much for your presentation. Thank you, Your Honor. Thank you, Your Honor. A few things I want to respond to here. And I'd like to start with the fact that counsel pointed to the discretion of the court to decide things. And here, what the district court did decide very clearly, as it said in the contempt hearing, is that there is not advertising. So if this court is going to defer to that finding, as it should, there was not advertising. That's the end of that. So then moving on to ripeness. The question here isn't just, is the product known? And before we move off from that, I would submit that the category here is extremely broad. What could be contemplated by what we have here, given current products on the market, would include earbuds. It would include glasses, like the one that we have here. So I wouldn't say any of those compete on the level of being in the same product category. We just don't know. Counsel also said in Mr. Altman's e-mail, of course he was talking about a product because the plaintiff had just demonstrated at the defendant's offices. The timing of that is absolutely incorrect. The e-mail that he was referring to was sent in March, and that product demonstration did not happen until May. And what that e-mail exchange was about was Mr. Ruglo asking for a $10 million investment. So it they were not talking about products. They were talking about sort of company-wide investments. So we don't have the video. It doesn't say we absolutely will release this product next year. It says we hope to have it next year. And then finally, we don't know what the name of the product is going to be. And that's really what separates it from all of the other ripeness cases that the plaintiff has relied upon. One final point is on the issue of irreparable harm. Once again, it is not harm they've pointed to that is redressable through an injunction. And in the letter they submitted to this Court just a few days ago, they confirmed that. The injunction has been in place for more than five months now, and they've said twice in that letter, they said the harm is still ongoing. So it's clear the injunction is not stopping whatever harm they perceive. Thank you very much. Thank you, Ms. Caruso. Thank you, Mr. Viola. This case is submitted. I want to thank the staff of the Browning Courthouse for their work this week. That concludes our hearings for the week, and the Court is adjourned. Thank you.
judges: THOMAS, BRESS, MENDOZA